IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MAIK EVERT ENS LOBLEIN,
    Petitioner,

v.                            Civil No. 3:25-cv-737

ROXANA ANDREA ALCARAZ DE ENS,
    Respondent.

### MEMORANDUM OPINION

The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), ratified by Congress under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq., requires that, when a child under the age of sixteen has been wrongfully removed or retained from his or her country of habitual residence, a court generally must order the return of the child unless certain exceptions apply. Petitioner Maik Evert Ens Loblein ("Petitioner" or "Mr. Ens Loblein"), pursuant to his AMENDED VERIFIED PETITION FOR THE RETURN OF CHILDREN TO PARAGUAY (the "Amended Verified Petition") (ECF No. 7) brought under the Hague Convention and ICARA, alleges that his wife, Roxana Andrea Alcaraz de Ens ("Respondent" or "Ms. Alcaraz"), has been wrongfully retaining their two minor children, S.I.E.A. and M.A.E.A., in the United States since February 27, 2025.

The Court held a bench trial to determine whether Ms. Alcaraz is wrongfully retaining S.I.E.A. and M.A.E.A. in the United States and, if so, whether any exception to ordering their return applies.

With the filing of PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [SEALED] (ECF No. 105), RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [SEALED] (ECF No. 114), and PETITIONER'S REPLY TO RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [SEALED] (ECF No. 119), this matter is now ripe for review.

For the reasons set forth below, although Ms. Alcaraz is wrongfully retaining the parties' two minor children, S.I.E.A. and M.A.E.A., in the United States, she has established, by clear and convincing evidence, that there is a grave risk that the return of S.I.E.A. and M.A.E.A. to Paraguay would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation. Accordingly, Petitioner Maik Evert Ens Loblein's Amended Verified Petition (ECF No. 7) will be denied.

## I. BACKGROUND

On September 15, 2025, Mr. Ens Loblein filed the Amended Verified Petition under the Hague Convention and ICARA seeking the return of his two children, S.I.E.A. and M.A.E.A., to Paraguay where, if necessary, any further custody determination can be made by a Paraguayan court. Under the expedited Hague Convention timeline, the Court held a bench trial on December 4, 10, and 12, 2025, during which the parties presented evidence. At the conclusion of the third day of trial, the Court set oral argument for February 18, 2026, on whether Ms. Alcaraz had established, by

2

clear and convincing evidence, that the "grave risk" exception under Article 13(b) of the Hague Convention applies in this case.

## II. FINDINGS OF FACT

### A. Timeline of Events

Mr. Ens Loblein and Ms. Alcaraz initially met on December 7, 2013. December 4 Tr. at 10:13-14. In 2014, before they were married, they lived together for four to five months in Ms. Alcaraz's parents' home. Id. at 10:19-23. Mr. Ens Loblein and Ms. Alcaraz were married on May 7, 2016. Id. at 9:21-22; Respondent's Trial Ex. 3. At that time, Ms. Alcaraz moved from Asunción to Neuland Colony in El Chaco to live with Mr. Ens Loblein. December 12 Tr. at 258:1-9.[1]

The first identified physical altercation between Mr. Ens Loblein and Ms. Alcaraz occurred three or four months after the two were married. December 4 Tr. at 12:19-14:9. At the time, Ms. Alcaraz was pregnant with S.I.E.A. Id. at 85:19-86:6. The parties' descriptions of this altercation differ; each account is set forth below.

According to Mr. Ens Loblein, he and Ms. Alcaraz had been invited to a friend's house for dinner. Id. at 12:19-14:9. As the two were heading home, Ms. Alcaraz "started to complain out of

---

[1] The distance from Asunción to Neuland Colony is approximately 500 kilometers (311 miles), and the drive between the two places takes approximately five to six hours depending on road conditions. Id. at 259:12-20.

3

jealousy because of a female that was at that same spot." Id. Ms. Alcaraz "started talking to [him] louder and louder and ended up yelling and . . . [he] asked her to either calm down or to be quiet." Id. At that point, Ms. Alcaraz "got in front of [him] as if she was going to push [him] or hit [him] and [he] defended [himself] by lifting up [his] arm." Id. Mr. Ens Loblein's arm somehow made contact with Ms. Alcaraz's mouth, splitting her lower lip. Id. Mr. Ens Loblein asserted that he was actively driving when that contact occurred. Id. Mr. Ens Loblein stated that Ms. Alcaraz never made a complaint to police or the courts in Paraguay regarding this incident. Id.

According to Ms. Alcaraz, this incident was the first physical altercation with Mr. Ens Loblein. December 12 Tr. at 263:4-265:13. Ms. Alcaraz recalled being invited to dinner with some of Mr. Ens Loblein's friends. Id. While at that dinner, a woman started talking to Ms. Alcaraz about "things about [Ms. Alcaraz's] personal life" that had occurred before Mr. Ens Loblein and Ms. Alcaraz were married, while they were still "boyfriend and girlfriend . . . ." Id. Ms. Alcaraz was surprised that this woman knew things about her personal life from when Mr. Ens Loblein and Ms. Alcaraz were dating because Ms. Alcaraz did not know the woman back then. Id. While driving away from the dinner, Ms. Alcaraz asked Mr. Ens Loblein how this woman knew these personal details. Id. At that point, Mr. Ens Loblein "hit [her] with a fist in [her]

4

mouth . . . , then he grabbed [her] head, and put it on top of the glove compartment of the car" whereupon "[h]e told [her] that a wife should not speak to her husband in that way." Id. Following that incident, Ms. Alcaraz stated that her "mouth was swollen with a scar, with a lesion." Id.

Mr. Ens Loblein and Ms. Alcaraz went on to have two biological children together, S.I.E.A. and M.A.E.A. December 4 Tr. at 9:23-10:9. Their daughter, S.I.E.A., was born on April 3, 2017. Id. Their son, M.A.E.A., was born on May 6, 2019. Id.

In October 2019, Ms. Alcaraz filed her first domestic violence complaint against Mr. Ens Loblein. Id. at 14:10-13. Following what Mr. Ens Loblein described as a verbal, non-physical altercation that had occurred between him and Ms. Alcaraz the night before, police arrived the next morning at Mr. Ens Loblein's workplace and delivered the complaint. Id. at 14:10-16:11. Mr. Ens Loblein could not recall any details about the incident. Id.

On November 18, 2019, after Ms. Alcaraz filed the complaint, a Paraguayan court issued a "keep-away" order that prohibited Mr. Ens Loblein from coming into contact with Ms. Alcaraz. Id.; Respondent's Trial Ex. 4. Mr. Ens Loblein asserted that he respected the keep-away order and that, upon being summoned, he appeared for a hearing in the matter approximately three days after the complaint had been filed. December 4 Tr. at 14:10-16:11.

Following that hearing, Ms. Alcaraz took both S.I.E.A. and M.A.E.A. with her to Asunción for two to three weeks. Id.

Ms. Alcaraz subsequently indicated to the Paraguayan court that, having talked with Mr. Ens Loblein, she wanted to return home and requested that the Paraguayan court remove the measures imposed by the keep-away order. Petitioner's Trial Ex. 4. On December 3, 2019, in response to this request, the Paraguayan court amended the order by lifting the exclusion from the home and the prohibition of approach and instead imposing a prohibition on mutual assault and abuse between Mr. Ens Loblein and Ms. Alcaraz. Id.; Respondent's Trial Ex. 8. Additionally, the modified order instructed Mr. Ens Loblein and Ms. Alcaraz to pursue therapeutic support. Petitioner's Trial Ex. 4; Respondent's Trial Ex. 8. Following the entry of this amended order, Mr. Ens Loblein and Ms. Alcaraz each attended separate therapy sessions. December 4 Tr. at 17:24-18:2. Ms. Alcaraz subsequently returned to Neuland to live with Mr. Ens Loblein. Id. at 19:15-21.

Following this incident, Mr. Ens Loblein described their relationship as "changed a lot for the better" and stated that "[t]here were several beautiful years" between 2020 and 2022. Id. at 19:22-20:2. However, the factual record in this case does not fully support that assertion.

On March 19, 2021, Ms. Alcaraz filed a "complaint regarding abandonment" with the police in which she notified the authorities

6

that "she left her home [with her two minor children] . . . due to relationship incompatibility with [Mr. Ens Loblein]." Respondent's Trial Ex. 9. Near the end of October 2022, Ms. Alcaraz filed her second domestic violence complaint against Mr. Ens Loblein. December 4 Tr. at 29:8-24. On October 27, 2022, Ms. Alcaraz called the police to report an incident of domestic violence. Respondent's Trial Ex. 10. According to the police report, Ms. Alcaraz told police she "had an argument and a struggle" with Mr. Ens Loblein and stated that similar incidents had occurred in the past. Id. The report also noted that Mr. Ens Loblein "left the location voluntarily in search of a solution" and that "[a]t first glance, no signs of violence were observed." Id.

Mr. Ens Loblein testified that he did not recall physically striking or verbally abusing Ms. Alcaraz in that incident. December 4 Tr. at 29:8-24. Mr. Ens Loblein was never convicted based on this second domestic violence complaint. Id. However, this incident, which prompted the second domestic violence complaint, led to a hearing on November 1, 2022, during which Mr. Ens Loblein stated that this was the second time he and Ms. Alcaraz had "been in such a situation" and that they "had previously attended couples therapy and did quite well for almost three years." Petitioner's Trial Ex. 5. The Paraguayan court then directed psychological evaluations to be conducted for both parties before the court issued any ruling. Id. The psychological evaluation of Ms. Alcaraz

7

was filed with the Paraguayan court on December 9, 2022. Respondent's Trial Ex. 6. During the psychological evaluation, Ms. Alcaraz stated that she previously had left the house six times and was convinced by Mr. Ens Loblein to return each time, "but each time the situation worsened until this year when he also physically assaulted [her], threw [her] to the floor, got on top of [her], and choked [her] . . . . When he got nervous, he would lock [her] and the children in and start shouting and breaking things, throwing everything around." Id.

After the filing of the second domestic violence complaint, Ms. Alcaraz again took both S.I.E.A. and M.A.E.A. with her to Asunción to stay with her parents. December 4 Tr. at 29:25-30:1, 31:16-22. Ms. Alcaraz and the children stayed in Asunción for approximately a month and a half before returning with the children to Mr. Ens Loblein's home in Neuland in December 2022. Id. at 31:16-22.

Mr. Ens Loblein testified that Ms. Alcaraz and the children stayed in his home from December 2022 until March 2023. Id. at 32:5-9. In March 2023, Ms. Alcaraz and the children left his home once again after Ms. Alcaraz filed her third domestic violence complaint against Mr. Ens Loblein. Id. Once again, the parties' descriptions of this altercation differ; each will be presented in turn.

8

According to Mr. Ens Loblein, in March 2023, he returned from work to find Ms. Alcaraz "at home with her friends drinking beer." Id. at 32:8-33:7. He asked Ms. Alcaraz whether the children had eaten dinner and taken a bath. Id. Ms. Alcaraz responded that they had not. Id. In turn, Mr. Ens Loblein stated that he "order[ed] some pizza and then [took] the children to take a shower and then [took] them to bed." Id. Mr. Ens Loblein testified that Ms. Alcaraz finished her party around 1:00 or 1:30 A.M., even though S.I.E.A. had classes the next day. Id. Mr. Ens Loblein recalled asking Ms. Alcaraz "if it wouldn't be more appropriate to finish those parties earlier." Id. Mr. Ens Loblein further claimed that Ms. Alcaraz was drunk and started yelling at him, so he went outside and only returned once Ms. Alcaraz had fallen asleep. Id. The following morning, Mr. Ens Loblein testified that he attempted to take S.I.E.A. to school, but Ms. Alcaraz started yelling at Mr. Ens Loblein, grabbed the children, and then told Mr. Ens Loblein that he was not going to take the children anywhere. Id. When Mr. Ens Loblein returned from work later that day, Ms. Alcaraz and the children were no longer at his home. Id. Mr. Ens Loblein was notified about a domestic violence complaint made following this incident but denied physically assaulting Ms. Alcaraz. Id. at 33:8-13.

Ms. Alcaraz testified that this incident followed a party that was held at the home in Neuland in 2021, not March 2023.

9

December 12 Tr. at 272:1-273:1. Ms. Alcaraz asserted that Mr. Ens Loblein came home from work around 10:00 P.M. and told Ms. Alcaraz it was "time for the friends to retire." Id. Ms. Alcaraz stated that Mr. Ens Loblein disagreed with how late they were staying up. Id. When describing the party, Ms. Alcaraz testified that they were eating pizza, the children were playing, and there were no alcoholic beverages. Id. Following this interaction, Ms. Alcaraz testified that the argument turned physical and that, in the presence of M.A.E.A., Mr. Ens Loblein hit Ms. Alcaraz. Id.

On March 20, 2023, Ms. Alcaraz filed her third domestic violence complaint against Mr. Ens Loblein. According to the complaint filed with the police:

> [Mr. Ens Loblein] was very violent, uncontrollable, and altered at that moment, verbally insulting [Ms. Alcaraz] with obscene words, and also physically assaulting her by hitting her with fists, grabbing her tightly in a hold, pushing her to the floor, and getting on top of her chest while hitting her on the head, mocking her by asking if her brain was all right and if she understood his actions. All of this occurred in front of their minor children . . . who were both trying to rest.

Respondent's Trial Ex. 11. It is unclear whether Ms. Alcaraz's third domestic violence complaint stems from the party incident, which Ms. Alcaraz says took place in 2021. The date of the third complaint suggests otherwise. In any event, on March 19, 2023, the day before filing her third domestic violence complaint, Ms. Alcaraz went to the hospital for treatment of her injuries, and the medical report diagnosed "[m]ultiple physical traumas from

10

direct impact with a blunt object on the head and upper limbs" and "[e]xcoriations due to mechanical rubbing action." Respondent's Trial Ex. 7; December 12 Tr. at 277:12-280:9. On March 31, 2023, a Paraguayan court entered emergency measures to protect Ms. Alcaraz against domestic abuse. Petitioner's Trial Ex. 15.

Both Mr. Ens Loblein and Ms. Alcaraz testified that, in March 2023, Ms. Alcaraz once again took both S.I.E.A. and M.A.E.A. with her to Asunción to stay with her parents. December 4 Tr. at 33:14-34:20; December 12 Tr. at 277:12-278:2. Mr. Ens Loblein stated that he was unable to communicate with his children during March and part of April because Ms. Alcaraz would not allow contact, despite his attempts. December 4 Tr. at 33:14-34:20. Beginning in April, and continuing into May of 2023, Mr. Ens Loblein, with Ms. Alcaraz's authorization, was communicating with Ms. Alcaraz and the children again by way of WhatsApp, an instant messaging application. Id. at 36:1-19.

On May 18, 2023, a forensic psychological report of Ms. Alcaraz prepared by Professor Enrique Eduardo Bieber Viola was filed in the Paraguayan Court. Petitioner's Trial Ex. 6. Throughout the report, Ms. Alcaraz recounted multiple instances of physical abuse that she had suffered at the hands of Mr. Ens Loblein, some of which had occurred in the presence of their children. See id. ("He hit me in front of the children. Once I stood up for [sic] him and he grabbed me, threw me to the floor, and tried to strangle

11

me. The children sat at the table crying for help and telling him to let me go. He let go when I started coughing, and then the children hugged me as I lay on the floor."). Ms. Alcaraz also described an incident where Mr. Ens Loblein picked up Ms. Alcaraz to return her to Neuland following one of the times she left for Asunción. During this incident, Ms. Alcaraz alleged that Mr. Ens Loblein drove at speeds of approximately 110 miles per hour while "saying that [their] lives were in his hands . . . ." Id.

At some point in June 2023, S.I.E.A. and M.A.E.A. returned to Neuland to live with Mr. Ens Loblein pursuant to a private agreement between Mr. Ens Loblein and Ms. Alcaraz. December 4 Tr. at 67:3-18. Ms. Alcaraz did not return at that time because there was an outstanding restraining order against Mr. Ens Loblein. Id.

Then, on July 7, 2023, Mr. Ens Loblein took S.I.E.A. and M.A.E.A. to visit Ms. Alcaraz for their first week of winter vacation. Id. at 67:25-68:14. However, at the end of that week, Ms. Alcaraz told him that he could not pick up the children and that they would not return to his home in Neuland. Id. In turn, S.I.E.A. and M.A.E.A. stayed with Ms. Alcaraz for an extra week in Asunción. Id. at 69:9-18. At the end of that week, Ms. Alcaraz returned to Neuland with both S.I.E.A. and M.A.E.A. Id.

At that time, the keep-away order against Mr. Ens Loblein was still in effect. Id. at 69:20-70:6. However, on August 10, 2023, following a request by Ms. Alcaraz to withdraw the complaint from

12

March 2023, the Paraguayan court lifted the protective measures imposed by the order entered on March 31, 2023, and instead imposed a mutual prohibition against violence between Mr. Ens Loblein and Ms. Alcaraz. Petitioner's Trial Ex. 15.

According to Mr. Ens Loblein's testimony, Ms. Alcaraz stayed in Neuland until July 30, 2023. December 4 Tr. at 70:7-22. Mr. Ens Loblein stated that he began discussing with Ms. Alcaraz "how [they would] fix the case that was open and figure out where the kids would live, with her or with [him]." Id. Mr. Ens Loblein asserted that this "bothered [Ms. Alcaraz] a lot" and he claimed that she began to verbally assault him. Id. In response, Mr. Ens Loblein testified that he began to record the situation with his cellphone, but Ms. Alcaraz was upset by this and, in turn, tried to take his phone and bit him on the hand. December 12 Tr. at 308:7-15; Petitioner's Trial Ex. 9. Eventually, the police arrived and filed a report regarding this incident. December 4 Tr. at 70:7-22. Mr. Ens Loblein maintains that, during this July 30, 2023 altercation, he did not strike or push Ms. Alcaraz. Id. at 72:22-73:7. Instead, he claims that Ms. Alcaraz grabbed him by the neck, tried to take his cellphone, and threw him to the floor. Id.

Ms. Alcaraz had a different recollection of these events. Ms. Alcaraz testified that, on that day, she had reminded Mr. Ens Loblein that he was supposed to be outside of his home in Neuland. December 12 Tr. at 282:25-285:15. Mr. Ens Loblein started provoking

13

.

her by blowing cigarette smoke into S.I.E.A.'s face. Id. After Ms. Alcaraz confronted Mr. Ens Loblein about that behavior, she claimed that Mr. Ens Loblein bit himself on the hand, which prompted her to tell him that he was crazy. Id. Ms. Alcaraz then testified that Mr. Ens Loblein put his phone camera in her face, and she told him that the "police ha[ve] to come and take [him] out of the house because [he is] mentally ill." Id. In response, Ms. Alcaraz alleged that Mr. Ens Loblein firmly grabbed her by the hand. Id. At this point, Ms. Alcaraz testified that she was trying to prevent Mr. Ens Loblein from getting the keys to the car and told S.I.E.A. to go call the police. Id. Mr. Ens. Loblein was not arrested or charged for what occurred that day. Id.

Mr. Ens Loblein introduced into evidence two video recordings taken during the July 30, 2023 incident. See Petitioner's Trial Ex. 9; Petitioner's Trial Ex. 10. The recordings capture portions of the interaction between the parties filmed by Mr. Ens Loblein using his phone, though the events depicted are, at times, difficult to discern. The videos show Ms. Alcaraz demanding that Mr. Ens Loblein give her his phone and the keys to the vehicle. Petitioner's Trial Ex. 9; Petitioner's Trial Ex. 10. The first recording also depicts a visible injury on Mr. Ens Loblein's hand that is consistent with a bite mark. Petitioner's Trial Ex. 9. However, the videos do not clearly establish which party initiated

14

physical confrontation or identify an aggressor. See generally id.; Petitioner's Trial Ex. 10.

Following the July 30, 2023 incident, Ms. Alcaraz, along with both S.I.E.A. and M.A.E.A., went to live in Asunción. December 4 Tr. at 75:1-10. Ms. Alcaraz and the children stayed in Asunción from July 2023 until December 2024, when they left for their trip to the United States. Id. While S.I.E.A. and M.A.E.A. lived in Asunción during this period, Mr. Ens Loblein testified that he saw Ms. Alcaraz and the children two to three times per month. Id. at 75:11-14. No new domestic violence complaints were made during this time. Id. at 75:18-21.

In November 2024, Ms. Alcaraz approached Mr. Ens Loblein about taking S.I.E.A. and M.A.E.A. to the United States for a trip. Id. at 76:13-22. Mr. Ens Loblein stated that Ms. Alcaraz represented to him that she would bring the children back and that her reason for visiting the United States was to see her mother, who had been diagnosed with cancer. Id. Mr. Ens Loblein testified that he would communicate with S.I.E.A. and M.A.E.A. three to four times per week after they first went to the United States, "[a]nd after that, a little less." Id. at 77:2-7. Mr. Ens Loblein never went to visit his children in the United States. Id.

At some point after December 25, 2024, Ms. Alcaraz informed Mr. Ens Loblein that she and the children would not return to

Paraguay. Id. at 77:8-14. Mr. Ens Loblein claims the last time he spoke with his children was on July 7, 2025. Id. at 78:10-11.

## B. Abuse Allegations

Ms. Alcaraz testified that throughout their marriage, Mr. Ens Loblein would hit her and that the children were "always" present during these incidents. December 12 Tr. at 265:14-266:15. The forensic psychological report of Ms. Alcaraz prepared by Professor Enrique Eduardo Bieber Viola outlined multiple accounts of such abuse, including the following incident described in the report:

> When [M.A.E.A.] was 9 months old, one Sunday the children and [Ms. Alcaraz] were outside in the living room of the house. [Mr. Ens Loblein] got up that day at 11 a.m., grabbed his omeprazole medicine, came over, put it in [Ms. Alcaraz's] face, and said, "It's your fault I have to live with this, you crazy woman." [Ms. Alcaraz] ignored him and took [M.A.E.A.] inside to change his diaper. [S.I.E.A.], who was 2 years old at the time, followed [Ms. Alcaraz]. [Mr. Ens Loblein] came in behind [them], locked the door, and started hitting and yelling at the three of [them]. The children, the baby in [Ms. Alcaraz's] lap, [Ms. Alcaraz] quickly grabbed [her] daughter with [her] other hand and put [S.I.E.A.] behind [her], and [Mr. Ens Loblein] wouldn't stop. [Ms. Alcaraz] said, "I'm sorry, I won't do it again." And then [Mr. Ens Loblein] left [them] and went outside.

Petitioner's Trial Ex. 6.

As to the children, Mr. Ens Loblein maintains that he never hit M.A.E.A. and only hit S.I.E.A. two times. December 4 Tr. at 89:15-25. Mr. Ens Loblein admitted that the first time he hit S.I.E.A. was when she was two months old. Id. at 91:17-92:2. Mr. Ens Loblein testified that, while Ms. Alcaraz was changing

16

S.I.E.A.'s diaper, S.I.E.A. would not stop screaming so Ms. Alcaraz called Mr. Ens Loblein over for help. Id. Mr. Ens Loblein stated that he "[gave] her a little hit in her rear part" to get S.I.E.A. to stop screaming. Id.

According to Ms. Alcaraz, during this incident, she heard a strong slap followed by shrieking from S.I.E.A. December 12 Tr. at 266:20-267:23. Ms. Alcaraz asserts that she then went over to where Mr. Ens Loblein and S.I.E.A. were and saw Mr. Ens Loblein yelling at S.I.E.A. to shut up. Id. Ms. Alcaraz testified that she told Mr. Ens Loblein that he should not yell at or hit a baby, but he responded that it was necessary "to discipline a baby from the very beginning" and then hit Ms. Alcaraz in the head and said "I hope your head turns well, turns out right." Id.

Mr. Ens Loblein testified that the second time he hit S.I.E.A. occurred when she was learning to ride a bike. December 4 Tr. at 92:3-17. Mr. Ens Loblein recounted that S.I.E.A. told him she could not ride the bike and started screaming, so Mr. Ens Loblein, in response, "grabbed a little branch and . . . hit her slightly in her rear part" and told S.I.E.A. not to scream at him again. Id. Mr. Ens Loblein asserted that S.I.E.A. was not injured during either incident nor did she go to the hospital. Id. at 92:21-93:2. No police complaints were made following either incident. Id.

As to the second incident, Ms. Alcaraz testified that Mr. Ens Loblein, while teaching S.I.E.A. how to ride a bike, struck

17

S.I.E.A. on her thigh using a stick he had taken from a tree. December 12 Tr. at 268:22-269:19. Ms. Alcaraz asserted that this was the first mark that Mr. Ens Loblein left on S.I.E.A., while she was still only 3 years old. Id.

In general, Ms. Alcaraz maintains that Mr. Ens Loblein regularly hit S.I.E.A. from the time she was 2 months old until they left Mr. Ens Loblein's house for the final time in July 2023. Id. at 270:6-13. According to Ms. Alcaraz, Mr. Ens Loblein would hit S.I.E.A. "[a]lmost all of the time in order to educate her." Id. at 268:2-269:19 ("Well, since she was a baby, he had been hitting S.I.E.A. with a stick . . . because it was his way of educating her or he would pull her arm or, you know, tell her to behave or he would grab her . . . ."). As to M.A.E.A., Ms. Alcaraz testified that Mr. Ens Loblein would hit M.A.E.A. on the thigh or butt with his hand but never left a mark on M.A.E.A. because he "is a little bit calmer and more keeps to himself." Id. at 270:19-271:14. By contrast, according to Ms. Alcaraz, "S.I.E.A. was the type who [would] tell her dad things to his face." Id.

Additionally, Ms. Alcaraz presented a concerning photograph into the record. The photograph depicts Mr. Ens Loblein holding his erect penis next to M.A.E.A., who was approximately two and a half years old at the time the photograph was taken. December 4 Tr. at 23:8-24:2; Respondent's Trial Ex. 18. Mr. Ens Loblein testified that the photo was taken in Asunción at Ms. Alcaraz's

18

parents' house. December 4 Tr. at 24:20-22. By way of explanation, Mr. Ens Loblein claimed that he and Ms. Alcaraz would regularly engage in this sort of behavior to "excite each other that way to have sexual relationships . . . [b]ehind the backs of the children." Id. at 27:1-10. Ms. Alcaraz also testified that there was a time when Mr. Ens Loblein, thinking Ms. Alcaraz and the children were asleep, proceeded to masturbate while Ms. Alcaraz and the children were in the same bed as him. December 12 Tr. at 289:16-293:15. Ms. Alcaraz conceded that this was the only time she observed Mr. Ens Loblein engage in sexual behavior in front of the children. Id. Mr. Ens Loblein's explanation of the photograph does nothing to dispel the concern that the photograph engenders. Indeed, the explanation offered by Mr. Ens Loblein describes the photograph as depicting repeated conduct, heightening the concern.

## C. Examination of S.I.E.A.

In this case, the Court examined S.I.E.A. in chambers. When asked whether she liked living in Paraguay, she answered no "[b]ecause [her] father was very bad with everybody, with [her], . . . [her] brother, and [her] mother." Sealed December 4 Tr. at 6:16-7:2. When asked to clarify what she meant by "very bad," S.I.E.A. responded that Mr. Ens Loblein would "hit[] us without any reason, scream[] at us without any reason." Id. at 7:3-9. When asked what Mr. Ens Loblein would hit her with, S.I.E.A. testified that Mr. Ens Loblein would hit her "[s]ometimes with a

19

stick, sometimes with his belt." Id. at 9-12. S.I.E.A. categorized these as "spankings," but she stated that she was sometimes left with bruises or cuts and bled more than once as a result. Id. at 7:13-8:9. When asked how many times Mr. Ens Loblein had hit her, S.I.E.A. responded, "I think five or six." Id. at 8:10-12. S.I.E.A. also stated that Mr. Ens Loblein "would always hit [Ms. Alcaraz] a lot." Id. at 8:13-24. S.I.E.A testified that she did not ever see Ms. Alcaraz hit Mr. Ens Loblein. Id.

When asked about times that S.I.E.A. stayed with Mr. Ens Loblein's parents, S.I.E.A. said she did not feel comfortable while she lived there "[b]ecause they were also bad. . . . They would ignore us. They would leave us aside. They would scream at us because we didn't do anything." Id. at 9:3-10:5. S.I.E.A. added that Mr. Ens Loblein's mother hit S.I.E.A.'s hand and M.A.E.A.'s hand with her own hand and that this hurt. Id. at 10:6-17. Mr. Ens Loblein's mother admitted to swatting each of the children's hands but testified that it was to discipline them for lying about breaking one of her plants. December 4 Tr. at 112:16-113:20. Mr. Ens Loblein's mother asserted that she never physically or verbally assaulted the children any other time. Id.

When asked whether she wants to return to Paraguay, S.I.E.A. answered no "[b]ecause over there, they were treating us very, very, very bad, and I don't want that to happen again." Sealed December 4 Tr. at 11:16-22. When asked if there was anybody in her

20

family that she was afraid of, S.I.E.A. stated that she was afraid of her father and her father's parents. Id. at 11:23-12:6.

D. **Examination of Dr. Aníbal Pérez-Liñán**

The Court accepted Dr. Aníbal Pérez-Liñán as an expert "on the Paraguayan legal system's institutional capacity to protect victims of domestic violence, enforce protective orders, and maintain effective system[s] of criminal accountability, considering Paraguay's legal framework governing domestic violence and child protection, the institutional performance of the judicial prosecutors and police in the area, empirical data respecting enforcement patterns[,] and structural barriers that impede reliable protection of certain petitioners." December 10 Tr. at 210:24-211:12. Dr. Pérez-Liñán concluded, based on his review of an article by Susana Torres published in 2003 that analyzed 17 cases of sexual crimes against minors filed in Asunción's lower courts, "that the evidence underscores the ineffectiveness of the legal system to hold perpetrators accountable . . . ." Id. at 220:25-221:20. While Dr. Pérez-Liñán testified that "the Paraguayan state has made an effort to improve laws to protect victims of domestic violence and child abuse," he stated that the situation, compared to other Latin American countries, is not good in part because the courts and judicial systems are not responding sufficiently to address the situation. Id. at 232:7-17.

21

On cross-examination, Dr. Pérez-Liñán conceded the following: (1) Article 60 of Paraguay's Constitution explicitly recognizes the need to prevent violence in the family; (2) since 1997, Paraguay's criminal code includes Article 229, which punishes domestic violence offenders by one to six years of imprisonment (potentially increased to ten years in the event of serious injury); (3) since 2000, Paraguay has Law 1600/00 that provides a summary process before the local Courts of Peace for those seeking prompt, protective measures; (4) in 2001, Paraguay passed a law against violence for the protection of children; (5) in 2016, Paraguay passed another law to protect women from violence; and (6) the most common grounds for incarceration in Paraguay are charges of domestic violence and failure to comply with child support obligations. Id. at 239:20-242:18. Additionally, it was highlighted on cross-examination that, in support of his conclusion, Dr. Pérez-Liñán had relied upon an analysis done by Susana Torres of 17 cases of sexual crimes against minors that were filed during the first half of 2000, as well as two newspaper articles. Id. at 244:24-245:25. One was from January 2025 and described several claims that were dismissed because the public prosecutor's office failed to bring charges before certain deadlines. Id. The other described a domestic violence incident from 2013 for which prosecutors took no action, such that the statute of limitations expired before charges were brought. Id.

22

As finder of the facts, the Court finds the testimony of Ms. Alcaraz to be credible. In making that determination, the Court has applied the instructions ordinarily given to jurors regarding the assessment of witness credibility. See Kevin F. O'Malley, Jay E. Grenig & Nadine Jean Wichern, Federal Jury Practice and Instructions § 105.01 ("Credibility of Witnesses"), at 271-72 (7th ed. 2024). Applying that guidance, and considering the record as a whole, the Court finds that the objective evidence, where available, supports Ms. Alcaraz's testimony. For similar reasons, the Court also finds the testimony of S.I.E.A. to be credible.

And, applying the same measure, namely, the jury instructions regarding credibility and the evidentiary record, the Court does not find Mr. Ens Loblein to be credible. Nor does this Court place much stock in the testimony of Lidia Isabel Loblein de Ens, Mr. Ens Loblein's mother.

The testimony of Dr. Pérez-Liñán, although based on limited information, is consistent with the United States Department of State 2023 Human Rights Report for Paraguay. See infra pp. 34-36.

### III. CONCLUSIONS OF LAW

"In adopting the Hague Convention, the signatory nations sought 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of

access.'" <u>Miller v. Miller</u>, 240 F.3d 392, 398 (4th Cir. 2001) (quoting Hague Convention, Pmbl., 19 I.L.M. 1501).[2] "[T]he scope of a court's inquiry under the Hague Convention is limited to the merits of the abduction claim" and not the merits of any underlying custody case. <u>Miller</u>, 240 F.3d at 398 (citing 22 U.S.C. § 9001(b)(4)).

To make a *prima facie* case, Mr. Ens Loblein, as Petitioner, was required to establish, by a preponderance of the evidence, that his children were "wrongfully removed or retained within the meaning of the [Hague] Convention." 22 U.S.C. § 9003(e)(1)(A). "A petitioner can establish that the removal of a child is 'wrongful' where: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal." <u>Bader v. Kramer</u>, 484 F.3d 666, 668 (4th Cir. 2007) (citing <u>Humphrey v. Humphrey</u>, 434 F.3d 243, 246 (4th Cir. 2006)).

Once a *prima facie* showing of wrongful retention or removal is made, "the burden shifts to the abducting parent to show that an exception applies and the court should not order the return of

---

[2] Both the United States and Paraguay are signatories. <u>See</u> Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

the child." <u>Kovačić v. Harris</u>, 328 F. Supp. 3d 508, 517 (D. Md. 2018); <u>see also</u> <u>Golan v. Saada</u>, 596 U.S. 666, 670 (2022) ("Return of the child is, however, a general rule, and there are exceptions."). As relevant to this case, the Hague Convention provides that return is not required if "[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b), 19 I.L.M. at 1502.

Both Mr. Ens Loblein and Ms. Alcaraz have stipulated that Mr. Ens Loblein has satisfied the *prima facie* elements under the Hague Convention. ECF No. 81-1 at 1-3. The dispositive question, then, is whether Ms. Alcaraz has satisfied her burden of establishing, by clear and convincing evidence, that the "grave risk" exception set forth in Article 13(b) of the Hague Convention applies. 22 U.S.C. § 9003(e)(2)(A).

**A. Grave Risk Exception**

**1. Legal Standard**

To establish the "grave risk" exception, the respondent must show, by way of clear and convincing evidence, that "[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b), 19 I.L.M. at 1502. "As with each of the . . . exceptions, this defense is a narrow one." <u>Miller</u>, 240 F.3d at 402 (citing 42 U.S.C. § 9001(a)(4)). "The

narrow construction, however, should not give way to 'the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.'" Luis Ischiu v. Gomez Garcia, 274 F. Supp. 3d 339, 350 (D. Md. 2017) (quoting Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007)).

"To meet her burden under the article 13(b) exception, the respondent must establish that the alleged physical or psychological harm is 'a great deal more than minimal.'" Whallon v. Lynn, 230 F.3d 450, 459 (1st Cir. 2000) (quoting Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000)). "Indeed, the harm must be 'something greater than would normally be expected on taking a child away from one parent and passing him [or her] to another.'" Whallon, 230 F.3d at 459 (quoting Walsh, 221 F.3d at 218) (internal quotation marks omitted) (alteration in original). "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005) (citations omitted).

### 2. Finding Grave Risk as to S.I.E.A. and M.A.E.A.

Courts have found that "[s]ignificant physical and verbal abuse of a spouse and child can . . . establish a grave risk." Luis Ischiu, 274 F. Supp. 3d at 350; see, e.g., Simcox, 511 F.3d at 599, 608-09 (finding grave risk arising from the father's verbal

26

and physical abuse of the mother in the children's presence, as well as "frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and [pulling of] hair and ears" against the children); Van De Sande, 431 F.3d at 570-72 (finding evidence of grave risk sufficient to reverse the district court's granting of summary judgment for the father where the mother has shown that the father frequently and seriously beat, kicked, and choked the mother, verbally abused her, struck the child on several occasions, and threatened to kill the mother and the children).

"Courts have [also] found grave risk based on domestic abuse of the spouse in the presence of the children, even without abuse directed at the children themselves." Luis Ischiu, 274 F. Supp. at 351; see, e.g., Walsh, 221 F.3d at 210-11, 219-20 (setting aside allegations of direct physical and psychological abuse of the children, the First Circuit found a grave risk of exposure to physical or psychological harm to the children where the father demonstrated an uncontrollably violent temper, physically abused the mother for several years, often in front of the children, and had a history of fights with and threats against persons other than his wife); Baran v. Beaty, 526 F.3d 1340, 1345-46 (11th Cir. 2008) (finding grave risk of harm to the child where the father abused alcohol daily and often drove drunk, was physically and verbally abusive toward the mother in the child's presence, including by throwing furniture and other objects at her, and

27

recklessly and negligently endangered the child when they lived with the father).

Having reviewed the testimony offered, the exhibits submitted, and the arguments presented by both parties, the Court finds that Ms. Alcaraz has met her burden of showing, by clear and convincing evidence, that there is a grave risk that return of S.I.E.A. and M.A.E.A. to Mr. Ens Loblein in Paraguay would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation.

First, there is ample evidence in the record not only that Mr. Ens Loblein physically and verbally abused Ms. Alcaraz, but also that this abuse occurred in front of the children. Ms. Alcaraz, whom the Court has found to be credible, testified that throughout their marriage, Mr. Ens Loblein physically abused her and that the children were "always" present during these incidents. December 12 Tr. at 265:14-266:15. This assertion is supported by the testimony of S.I.E.A., whom the Court found to be highly credible. S.I.E.A. testified that Mr. Ens Loblein "would always hit [Ms. Alcaraz] a lot." Sealed December 4 Tr. at 8:13-24. Additionally, in the forensic psychological report of M.A.E.A., he

28

stated "[m]y dad hits my mom so much. I don't like him hitting her." Petitioner's Trail Ex. 6.[3]

Mr. Ens Loblein admitted that, in October 2019, his arm made contact with Ms. Alcaraz's mouth, splitting her lower lip. December 4 Tr. at 12:19-14:9. At that time, Ms. Alcaraz was pregnant with S.I.E.A. Id. at 85:19-86:6. Although Mr. Ens Loblein attempted to characterize this contact as a defensive maneuver that occurred while he was driving, the Court did not find Mr. Ens Loblein's characterization of events to be credible. Instead, the Court credits the testimony of Ms. Alcaraz which clearly describes abusive conduct that was not accidental.

In 2022, during her psychological evaluation, Ms. Alcaraz stated that she had previously left the house six times. Each time she was convinced by Mr. Ens Loblein to return, "but each time the situation worsened until this year when he also physically assaulted [her], threw [her] to the floor, got on top of [her], and choked [her] . . . . When he got nervous, he would lock [her] and the children in and start shouting and breaking things, throwing everything around." Respondent's Trial Ex. 6.

---

[3] M.A.E.A. was 3 years and 11 months old at the time he was interviewed for the purposes of generating the forensic report prepared by Professor Enrique Eduardo Bieber Viola. Id.

On March 20, 2023, Ms. Alcaraz filed her third domestic violence complaint against Mr. Ens Loblein with the police, reporting that:

> [Mr. Ens Loblein] was very violent, uncontrollable, and altered at that moment, verbally insulting [Ms. Alcaraz] with obscene words, and also physically assaulting her by hitting her with fists, grabbing her tightly in a hold, pushing her to the floor, and getting on top of her chest while hitting her on the head, mocking her by asking if her brain was all right and if she understood his actions. All of this occurred in front of their minor children . . . who were both trying to rest.

Respondent's Trial Ex. 11. That description is confirmed by the proof that: (1) Ms. Alcaraz went to the hospital for her injuries; and (2) the medical report noted "[m]ultiple physical traumas from direct impact with a blunt object on the head and upper limbs" and "[e]xcoriations due to mechanical rubbing action." Respondent's Trial Ex. 7; December 12 Tr. at 277:12-280:9.

Taken as a whole, the record supports a finding that Mr. Ens Loblein engaged in repeated acts of domestic violence against Ms. Alcaraz, frequently in the presence of the children. See Luis Ischiu, 274 F. Supp. at 351; Walsh, 221 F.3d at 210-11, 219-20; Baran, 526 F.3d at 1345-46. The Court so finds.

Second, the record supports a finding that Mr. Ens Loblein physically abused both S.I.E.A. and M.A.E.A. Mr. Ens Loblein admitted that the first time he hit S.I.E.A. was when she was only two months old. December 4 Tr. at 91:17-92:2. Mr. Ens Loblein testified that, while Ms. Alcaraz was changing S.I.E.A.'s diaper,

30

S.I.E.A. would not stop screaming, so he "[gave S.I.E.A.] a little hit in her rear part" to get S.I.E.A. to stop screaming. Id. Even accounting for the stresses associated with caring for a newborn, such conduct is unjustifiable and further supports a finding that Mr. Ens Loblein is an unstable person who has a propensity to use violence toward those closest to him. Mr. Ens Loblein testified that the second time he hit S.I.E.A. occurred when she was learning to ride a bike. Id. at 92:3-17. Mr. Ens Loblein recounted that S.I.E.A. told him she could not ride the bike and started screaming, so he "grabbed a little branch and . . . hit her slightly in her rear part" and told S.I.E.A. not to scream at him again. Id. Contrary to Mr. Ens Loblein's assertion that he only hit S.I.E.A. "slightly" on her rear, Ms. Alcaraz testified that this was the first mark that Mr. Ens Loblein left on S.I.E.A., and that occurred when she was only 3 years old. December 12 Tr. at 268:22-269:19. Mr. Ens Loblein's behavior during this incident, including his use of a stick to strike his three-year-old daughter, cannot be characterized as within the bounds of any reasonable form of discipline. Certainly, not of a three-year old.

Moreover, Ms. Alcaraz testified that Mr. Ens Loblein regularly hit S.I.E.A. from the time she was 2 months old until they left Mr. Ens Loblein's house for the final time in July 2023. December 12 Tr. at 270:6-13. She said that Mr. Ens Loblein hit S.I.E.A. "[a]lmost all of the time in order to educate her." Id.

31

at 268:2-269:19 ("Well, since she was a baby, he had been hitting S.I.E.A. with a stick . . . because it was his way of educating her or he would pull her arm or, you know, tell her to behave or he would grab her . . . ."). Using a stick to discipline a small child is violent conduct, not an acceptable means of educating the child.

As to M.A.E.A., Ms. Alcaraz testified that Mr. Ens Loblein would hit him on the thigh or butt with his hand but never left a mark on M.A.E.A. because M.A.E.A. "is a little bit calmer and more keeps to himself." Id. at 270:19-271:14. As further evidence of Mr. Ens Loblein's abuse of the children, S.I.E.A. testified that "[her] father was very bad with everybody, with [her], . . . [her] brother, and [her] mother." Sealed December 4 Tr. at 6:16-7:2. When asked to clarify what she meant by "very bad," S.I.E.A. responded that Mr. Ens Loblein would "[hit] us without any reason, [scream] at us without any reason." Id. at 7:3-9. When asked what Mr. Ens Loblein would hit her with, S.I.E.A. testified that Mr. Ens Loblein would hit her "[s]ometimes with a stick, sometimes with his belt." Id. at 9-12. Although S.I.E.A. categorized these as "spankings," she also said that she was sometimes left with bruises or cuts and bled more than once as a result. Id. at 7:13-8:9. When asked how many times Mr. Ens Loblein had hit her, S.I.E.A. responded, "I think five or six." Id. at 8:10-12. S.I.E.A.

32

testified that she was afraid of her father and her father's parents. Id. at 11:23-12:6.

Taken as a whole, the record supports the finding that Mr. Ens Loblein is a person inclined to violent behavior and that, for a course of years, he has engaged in that inclination, and, in so doing, he has been abusive of Ms. Alcaraz in the presence of the children and of the children as well. There is no basis to support any inference that the inclination to violence and the willingness to exercise that inclination has abated. Accordingly, there is a grave risk that the return of S.I.E.A. and M.A.E.A. to Paraguay would expose the children to physical or psychological harm at the hands of Mr. Ens Loblein or otherwise place the children in an intolerable situation.

Third, Mr. Ens Loblein's sexualized behavior around the children gives great cause for concern as to the psychological wellbeing of the children if they were returned to Paraguay. The evidence of sexually inappropriate behavior by Mr. Ens Loblein includes the nude photograph of Mr. Ens Loblein holding his erect penis proximate to M.A.E.A., December 4 Tr. at 23:8-24:2; the testimony from Ms. Alcaraz that Mr. Ens Loblein masturbated while in the same bed as Ms. Alcaraz and his two children, December 12 Tr. at 289:16-293:15; and Mr. Ens Loblein's habitual masturbation with audible pornography playing within earshot of the children, Petitioner's Trial Ex. 2. When considered as a whole, the record

33

demonstrates a troubling pattern of sexually inappropriate behavior in the children's presence. That record supports the conclusion that returning the children would expose them to a grave risk of psychological harm and would place them in an intolerable situation.

## B. Incapability or Unwillingness of the Country of Habitual Residence to Protect the Children

Now the analysis turns to the issue about the incapability or unwillingness of Paraguayan courts to protect against the identified grave risk. That issue first appears, somewhat obliquely, in RESPONDENT'S ANSWER AND AFFIRMATIVE DEFENSE TO PETITIONER'S AMENDED PETITION FOR THE RETURN OF THE CHILD TO PARAGUAY (ECF No. 29), which states:

> [s]pecifically, returning the children to Paraguay would expose them to domestic violence, including physical and sexual abuse by Petitioner, and Petitioner's parents, the children's paternal grandparents, in a country where law enforcement does not adequately protect citizens from this type of abuse and there continues to be high rates of femicide and domestic violence perpetrated against women by their male partners.

ECF No. 29 at ¶ 46 (emphasis added). That text cites to a United States Department of State, 2023 Human Rights Report for Paraguay.[4] See U.S. Dep't of State, 2023 Country Reports on Human Rights Practices: Paraguay (Apr. 22, 2024), https://perma.cc/QP8U-WBST. The Executive Summary of that report specified "[s]ignificant

---

[4] ECF No. 29 at ¶ 46 n.9.

human rights issues included credible reports of: . . . extensive gender-based violence, including domestic or intimate partner violence, sexual violence, femicide, and other forms of such violence . . . ." Id. In Section 6 of that report, entitled "Discrimination and Societal Abuses," it is said that Paraguayan law criminalized various forms of domestic and sexual violence. Id. The report also observed that:

> [a]lthough the law criminalized domestic violence, including psychological abuse, conviction required proof abuse was habitual and the aggressor and survivor were "cohabitating." Judges typically issued fines, but in some cases imprisoned convicted offenders to protect the survivor. In some instances, courts mediated instead of taking domestic violence cases to trial.
>
> According to NGOs and the Ministry of Women's Affairs, domestic violence was widespread. The National Police reported registering more than 11,000 complaints of domestic violence between January and August. In many instances survivors asked prosecutors to drop cases against their attackers due to fear of reprisals, allowing their attackers' crimes to go unpunished and potentially for the violence to continue.

Id.

The 2023 Human Rights Report for Paraguay also states that the Ministry of Women's Affairs opened a telephone hotline for survivors, operated a shelter, and coordinated survivor assistance efforts and training of police officers in how to handle domestic violence. Id. One form of gender-based violence is referred to as "femicide" and the report stated that "[f]emicide remained a serious problem." Id. Although Paraguayan law criminalized

35

femicide and "[o]fficials generally enforced the law and prosecuted femicide cases, . . . impunity in these cases remained high" because "[t]he judiciary often failed to adequately protect survivors, and police failed to enforce restraining orders against perpetrators already under house arrest or with pending arrest warrants." Id.

The issue next appears in the PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (ECF No. 66), where the argument is raised that "Respondent cannot establish . . . that Paraguayan courts" "are 'incapable or unwilling to give the child[ren] adequate protection.'" ECF No. 66 at 13 (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996) ("Friedrich II")) (alteration in original). The issue is raised once again in PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [SEALED] (post-trial) (ECF No. 105), wherein the Petitioner argues that Respondent cannot establish that the children are at risk of serious abuse or neglect, but "even if they were—Respondent cannot show that Paraguayan courts could not provide adequate protection." ECF No. 105 at 20, 23-25

Finally, in RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [SEALED] (post-trial) (ECF No. 114), she argues that "[a] responding parent can meet the burden of proving grave risk without proving a country's ability to protect the child from harm." ECF No. 114 at 10 (citing Baran, 526 F.3d at 1349 n.2;

36

Simcox, 511 F.3d at 598-99, 608-09). Here too, Respondent argues that "Paraguay has very high rates of domestic violence and femicide, and the court system is ill-equipped to properly investigate and prosecute all cases in a timely manner." ECF No. 114 at 8.

In sum, Petitioner takes the view that the issue (whether courts in the country of habitual residence are incapable or unwilling to give the child adequate protection) is an element of the grave risk exception. The Respondent argues that the issue is not part of the grave risk exception but does not indicate how, or in what context, the issue is to be analyzed.

So, by ORDER (ECF No. 130), the Court directed the parties to file briefs on the issue of whether the courts in the country of habitual residence are incapable or unwilling to give the child adequate protection is an element of establishing that a grave risk exists or, instead, is an ameliorative measure that the Court, in its discretion, can consider after finding that a grave risk has been established by clear and convincing evidence. The parties have since filed their respective briefs. See ECF Nos. 131, 132, 133, 135.

There is a split among the circuits, and considerable uncertainty in those decisions, as to whether a respondent asserting the grave risk exception to the Hague Convention is obligated to prove that courts and other authorities of the country

37

of habitual residence are incapable or unwilling to give the child adequate protection. <u>See</u> Jeremy D. Morley, <u>Split Circuits: The Grave Risk Exception to the Hague Abduction Convention</u>, Int'l Divorce (July 1, 2015), https://perma.cc/H9PQ-RD4T. Thus, a close look at this topic is necessary.

The notion that the respondent must prove the incapability or unwillingness of the courts of the country of habitual residence to adequately protect the child appears to have originated in <u>Friedrich II</u>, 78 F.3d 1060 (6th Cir. 1996), wherein the Sixth Circuit made the following comments:

> [i]n thinking about these problems, we acknowledge that courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly.
>
> . . .
>
> When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate.

<u>Id.</u> at 1068.[5] Later in <u>Friedrich II</u>, the Sixth Circuit observed as follows:

> [a]lthough it is not necessary to resolve the present appeal, we believe that a grave risk of harm for the purposes of the Convention can exist in only two

---

[5] The Sixth Circuit, in <u>Friedrich II</u>, cites no authority for the above-quoted statement. It does, however, contain a "<u>cf.</u>" citation to <u>Nunez-Escudero v. Tice-Menley</u>, 58 F.3d 374, 377 (8th Cir. 1995). However, beyond rejecting the argument that "the Article 13b 'intolerable situation' exception applies only if the government agencies and courts of Mexico are unable to protect the child if he is returned to that country[,]" <u>Nunez-Escudero</u> does not provide further commentary or guidance on this issue.

38

situations. . . . Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

Id. at 1069 (emphasis added).[6] Of course, the phrase "[a]lthough, it is not necessary to resolve the present appeal" clearly tells that the ensuing text (including "when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection") is dicta. And, that status was confirmed by the subsequent decision of the Sixth Circuit in March v. Levine, 249 F.3d 462, 471 (6th Cir. 2001) in which the court specifically stated that the above-quoted language from Friedrich II was dicta.

Friedrich II then appears in Blondin v. Dubois, 189 F.3d 240, 245 (2d Cir. 1999) (Blondin I), where the Second Circuit held that:

[i]n the exercise of comity that is at the heart of the Convention (an international agreement, we recall, that is an integral part of the 'supreme Law of the Land,' U.S. Const., art. VI), we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it.

Blondin I, 189 F.3d at 248-49 (citing Friedrich II, 78 F.3d at 1068). That conclusion was drawn from the observation that the structure of the Hague Convention itself:

depended on the institutions of the abducted-to state generally deferring to the forum of the child's home

---

[6] The first situation is not applicable in this case.

39

state. As noted above, such deference is necessary to preserve "the spirit of mutual confidence which is [the Convention's] inspiration."

Blondin I, 189 F.3d at 248 (citing Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session 426 (1980), ¶ 34) (internal citations omitted) (alteration in original). And it is that spirit of comity and mutual confidence that prompted the Second Circuit in Blondin I to say:

> [f]or this reason [(deference)], it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation.

Blondin I, 189 F.3d at 248 (emphasis added). In other words, Blondin I does not adopt Friedrich II's notion that the unwillingness or the incapability of the habitual residence court to protect a child is an element of an Article 13(b) grave risk defense. Rather, the Second Circuit views that examination as part of ameliorative measures.

In Blondin I, the Second Circuit remanded the case to the district court to make findings on possible ameliorative measures. Id. at 250. The district court did so, finding that "any repatriation arrangements . . . would expose [the children] to a 'grave risk' of psychological harm[,]" and, in turn, declined to return the children to France. Application of Blondin v. Dubois,

40

78 F. Supp. 2d 283, 285 (S.D.N.Y. 2000), aff'd sub nom. Blondin v. Dubois, 238 F.3d 153 (2d Cir. 2001) (Blondin II). In the appeal that followed, the Second Circuit discussed several undertakings of the petitioner in that case (Blondin) and by the French courts in respect of those undertakings. See Blondin II, 238 F.3d 153, 159 (2d Cir. 2001), abrogated by Golan v. Saada, 596 U.S. 666 (2022). Significantly, in conducting its examination of the capability and willingness of the courts in the country of habitual residence, the Second Circuit favorably quoted Walsh v. Walsh for the following proposition:

> [t]he undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction.

Blondin II, 238 F.3d at 159 n.8 (quoting Walsh, 221 F.3d at 219).

In Blondin II, the Second Circuit affirmed the conclusions of the district court that the courts in the country of habitual residence could not provide the children with adequate protection. Blondin II, 238 F.3d at 162.[7] The Second Circuit went on to conclude that the facts of the case "fall within the second standard set forth" in Friedrich II. Blondin II, 238 F.3d at 162-63 n.11 (citing

---

[7] In Blondin II, the court found that French authorities "cannot provide the necessary protection because doing so would require them to fulfill the impossible task of ensuring that a return to France would not trigger a recurrence of traumatic stress disorder in the children." Id. at 162-63.

41

Friedrich II, 78 F.3d at 1069 (noting that grave risk of harm exists "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection")). As a result, Blondin II is often regarded as authority for the proposition that the respondent in an ICARA case asserting the grave risk defense under Article 13(b) bears the burden of proving the incapability or unwillingness of the courts in the country of habitual residence to provide adequate protection. However, Blondin II did not actually place that burden on a particular party. Rather, it simply required that:

> the District Court must examine "the range of remedies that might allow both the return of the children to their home country and their protection from harm, pending a custody award in due course by a [court in the home country] with proper jurisdiction[.]"

Blondin II, 238 F.3d at 162-63 n.11 (quoting Blondin I, 189 F.3d at 249 (alteration in original).

In 2011, the Fourth Circuit in Miller quoted the Friedrich II dicta:

> [i]n thinking about these problems, we acknowledge that courts in the abducted—from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly . . . . When we trust the court system in the abducted—from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate.

42

<u>Miller</u>, 240 F.3d at 402 (quoting <u>Friedrich II</u>, 78 F.3d at 1068).

Having done so, the Fourth Circuit also expressed the view that:

> [it was] confident that if Ms. Miller truly poses a danger to her children, the Ontario courts are ready and able to take every step to protect them. <u>See</u> Ontario Court of Appeal Order, at 6 (remarking that "the parties are entirely free to request" a full hearing of the custody question).

<u>Miller</u>, 240 F.3d at 403. The Petitioner takes the view that <u>Miller</u> thus places the burden on Respondent to prove, as part of the grave risk assessment, that "the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." <u>Friedrich II</u>, 78 F.3d at 1069 (dicta). An examination of <u>Miller</u>, however, teaches that the decision did not go so far.

In <u>Miller</u>, the Fourth Circuit did not determine what role the "courts in the abducted—from country" were to play in the analysis of grave risk, and it did not place a burden on either party to adduce evidence respecting that issue.[8] More importantly, the <u>Miller</u> court specified what Miller was required to prove to prevail on the grave risk exception:

> [i]n order to prevail, therefore, Miller could show, by clear and convincing evidence, that: . . . there was a grave risk that the children's return to Ms. Miller would

---

[8] An examination of the district court's opinion in <u>Miller</u> reveals that there was no analysis of the capability or willingness of the courts in the abducted—from country to adequately protect the children. <u>See</u> <u>Miller v. Miller</u>, No. 3:99-MC-54 (W.D.N.C. Nov. 4, 1999). Indeed, that issue is not addressed at all nor is there a factual basis for it suggested in the quoted text from the appellate decision.

expose them to physical or psychological harm or otherwise place them in an intolerable situation . . . .

*Miller*, 240 F.3d at 398 (citations omitted). In other words, the Fourth Circuit identified the elements that the respondent must prove by clear and convincing evidence to successfully establish the grave risk exception by saying the respondent must prove that "there was a grave risk that the children's return to Ms. Miller would expose them to physical or psychological harm or otherwise place them in an intolerable situation . . . ." *Id.*[9] The comments made in *Friedrich II* regarding the capability or willingness of the courts in the country of habitual residence to protect the children were not identified by the Fourth Circuit in *Miller* as an element that was part of the grave risk exception.

In 2005, the Seventh Circuit explicitly rejected the dicta from *Friedrich II* in *Van De Sande*, 431 F.3d 567.[10] In rejecting the *Friedrich II* dicta, the Seventh Circuit held that:

> [t]here is a difference between the law on the books and the law as it is actually applied, and nowhere is the difference as great as in domestic relations. Because of the privacy of the family and parental control of children, most abuse of children by a parent goes

---

[9] The Fourth Circuit identified an alternative predicate that is not at issue here. *See id.* ("In order to prevail, therefore, Miller could show, by clear and convincing evidence, that: . . . the return of the children to Canada would not be permitted by the fundamental principles of the United States 'relating to the protection of human rights and fundamental freedoms[.]'").

[10] In so doing, the court noted the extent to which the dicta had been repeated, citing *March*, 249 F.3d at 471; *Miller*, 240 F.3d at 402; *Blondin II*, 238 F.3d at 162; and noted that the *Friedrich II* dicta "had influenced the district court in [*Van De Sande*,] but [the Seventh Circuit did] not think it correct." *Van De Sande*, 431 F.3d at 570.

44

> undetected. To give a father custody of children who are at great risk of harm from him, on the ground that they will be protected by the police of the father's country, would be to act on an unrealistic premise. The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody.

Van De Sande, 431 F.3d at 570-71 (internal citations omitted). The Seventh Circuit then went on to explain the frailty of the Friedrich II dicta, explaining that:

> [m]oreover, to define the issue not as whether there is a grave risk of harm, but as whether the lawful custodian's country has good laws or even as whether it both has and zealously enforces such laws, disregards the language of the Convention and its implementing statute; for they say nothing about the laws in the petitioning parent's country.

Van De Sande, 431 F.3d at 571.

In 2006, in In re Application of Adan, 437 F.3d 381 (3d Cir. 2006), abrogated by Golan v. Saada, 596 U.S. 666 (2022), the Third Circuit held explicitly that the removing parent must establish that "the court[s] in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Id. at 395 (quoting Blondin II, 238 F.3d at 162 (quoting Friedrich II, 78 F.3d at 1069)). However, beyond quoting Blondin II and its citation to Friedrich II, Adan gave no reason for reaching that conclusion. As explained previously, neither Blondin II nor Friedrich II actually held that it was respondent's burden to prove that the courts of the country of

45

habitual residence were unwilling or incapable of protecting the child. Hence, Adan is not persuasive.

In 2007, the Sixth Circuit again saluted Friedrich II in Simcox, 511 F.3d 594. In Simcox, the Sixth Circuit did not explicitly consider the earlier language from Friedrich II respecting the incapability or unwillingness of the courts in the country of habitual residence to adequately protect the children. However, the Sixth Circuit did focus on the topic of protecting the child if returned. In so doing, the Sixth Circuit explained:

> [t]hat protection may take the form of "undertakings," or enforceable conditions of return designed to mitigate the risk of harm occasioned by the child's repatriation. See Feder [v. Evans-Feder, 63 F.3d 217, 226 (3d Cir. 1995)] ("[I]n order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent.") . . . .

Simcox, 511 F.3d at 605-06. On that point, the Sixth Circuit held that "whether any valid undertakings are possible in a particular case is 'inherently fact-bound' and the petitioner proffering the undertaking bears the burden of proof." Id. at 605-06 (quoting Danaipour v. McLarey, 286 F.3d 1, 21, 26 (1st Cir. 2002)) (emphasis added). And the Sixth Circuit, again citing Danaipour, held that "[a] particular problem with undertakings—especially in situations involving domestic violence—is the difficulty of their enforcement." Simcox, 511 F.3d at 606 (citing Danaipour, 286 F.3d at 23).

46

In 2008, the Eleventh Circuit weighed in. See Baran, 526 F.3d 1340. In Baran the petitioning parent contended that:

> the grave risk analysis does not end when a court concludes the conditions to which the child will be returned pose a grave risk of harm. Rather . . . before denying a petition for return, the court must first determine whether the child's country of habitual residence is capable of protecting the child from the identified risk.

Id. at 1346. In response, the Eleventh Circuit addressed that question by first noting that:

> [n]either the Convention nor ICARA specifies the manner in which a reviewing court must assess whether a grave risk of harm to the child exists and whether that risk alone justifies denying a petition for return. Nevertheless, before denying a petition for return, some federal courts have required respondents to present evidence the child's country of habitual residence is not equipped to protect the child upon return.

Id. at 1346-47. The Eleventh Circuit identified the origin of that notion as the decision in Friedrich II and observed that the Sixth Circuit's formulation ("when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection") had been repeated and adopted by courts throughout the country. Baran, 526 F.3d at 1347; see Friedrich II, 78 F.3d 1069. The Eleventh Circuit then observed that, "[a]lthough a court is not barred from considering evidence that a home country can protect an at-risk child, neither the Convention nor ICARA require it to do so . . . ." Baran, 526 F.3d at 1348. In support of its conclusion, the Eleventh Circuit turned

47

to the previously discussed language from <u>Van De Sande</u> and then held, "we decline to impose on a responding parent a duty to prove that her child's <u>country of habitual residence is unable or unwilling to ameliorate</u> the grave risk of harm which would otherwise accompany the child's return." <u>Baran</u>, 526 F.3d at 1348 (emphasis added). In an accompanying footnote, the Eleventh Circuit stated that:

> our rule <u>does not prohibit courts from considering, as part of the discretionary decision to deny return</u> under Article 13(b), <u>whether the child's country of habitual residence may be able to protect</u> the child from harm. We simply hold that the <u>responding parent may meet her burden</u> of proving <u>grave risk</u> of harm <u>without adducing evidence regarding the home country's ability or willingness to offer the child protection</u>.

<u>Id.</u> at n.2 (emphasis added).

The Eleventh Circuit went on to discuss the concept of "undertakings," explaining that "[u]ndertakings commonly include restraining orders, arrangements for transportation and lodging costs, and sometimes include provisions for a child's education." <u>Id.</u> at 1349. The court went on to explain that there is a considerable difference between those commentators who advocate the use of undertakings and others who "have taken the position that undertakings are an unenforceable imposition on the ability of a home country to resolve custody disputes under the law of its own nation." <u>Id.</u> at 1350.

In 2022, the Supreme Court of the United States issued instructions respecting undertakings. Golan v. Saada, 596 U.S. 666 (2022). The decision in Golan helps with the issues in this case. In Golan, the Supreme Court granted certiorari:

> to decide whether the Second Circuit properly required the District Court, after making a grave-risk finding, to examine a full range of possible ameliorative measures before reaching a decision as to whether to deny return, and to resolve a division in the lower courts regarding whether ameliorative measures must be considered after a grave-risk finding.

Id. at 676. To begin its analysis, the Supreme Court reminded that:

> [u]nder the Hague Convention . . . , if a court finds that a child was wrongfully removed from the child's country of habitual residence, the court ordinarily must order the child's return. There are, however, exceptions to that rule. As relevant here, a court is not bound to order a child's return if it finds that return would put the child at a grave risk of physical or psychological harm. In such a circumstance, a court has discretion to determine whether to deny return.

Id. at 669. The Supreme Court then observed that, in the exercise of that discretion, district courts often consider "whether any 'ameliorative measures,' undertaken either 'by the parents' or 'by the authorities of the state having jurisdiction over the question of custody,' could 'reduce whatever risk might otherwise be associated with a child's repatriation.'" Id. (quoting Blondin I, 189 F.3d at 248) (emphasis added). Under the Second Circuit's pre-Golan jurisprudence, district courts in the Second Circuit were required to "independently 'examine the full range of options that might make possible the safe return of a child' before denying

return due to grave risk, even if the party petitioning for the child's return has not identified or argued for imposition of ameliorative measures." Golan, 596 U.S. at 669 (quoting Blondin II, 238 F.3d at 163 n.11).

In Golan, the analysis of the certified question began with the observation that the "Second Circuit's categorical requirement to consider all ameliorative measures is inconsistent with the text and other express requirements of the Hague Convention." Golan, 596 U.S. at 670. In particular, the Supreme Court explained that: "[t]he Convention itself nowhere mentions ameliorative measures. Nor does ICARA, which, as relevant, instructs courts to 'decide the case in accordance with the Convention' and accordingly leaves undisturbed the discretion recognized in the Convention." Id. at 676-77 (quoting 22 U.S.C. § 9003(d)).

In resolving these issues, the Supreme Court clearly instructed that: "[t]he question whether there is a grave risk, however, is separate from the question whether there are ameliorative measures that could mitigate that risk." Golan, 596 U.S. at 677 (emphasis added). The Supreme Court went on to explain that, in certain circumstances, whether ameliorative measures might be "appropriate or effective will often overlap considerably with the inquiry into whether a grave risk exists." Id. (citing Simcox, 511 F.3d at 607-08 (explaining that the appropriateness and utility of ameliorative measures correlate with the gravity of

50

the risk to the child)). However, as the Supreme Court made clear: "[t]he fact that a court may consider ameliorative measures concurrent with the grave-risk determination . . . does not mean that the Convention imposes a categorical requirement on a court to consider any or all ameliorative measures before denying return once it finds that a grave risk exists." Golan, 596 U.S. at 677-78 (emphasis added).

Quite clearly then, the Supreme Court has instructed that consideration of ameliorative measures (whether from the parents or by the court systems of the country of habitual residence) is not an element of the grave risk determination itself. Rather, "[t]he question whether there is a grave risk . . . is separate from the question whether there are ameliorative measures that could mitigate that risk." Id. at 677.[11] Instead, the evaluation of potential ameliorative measures arises, if at all, within the court's discretionary determination whether to order return after it makes a finding of grave risk and may in appropriate cases be

_____

[11] The Supreme Court has described "ameliorative measures" to include steps undertaken not only by the parents, but also "by the authorities of the state having jurisdiction over the question of custody" to reduce the risk associated with a child's return. See Golan, 596 U.S. at 669 (citing Blondin I, 189 F.3d at 248). Accordingly, the capability and willingness of the courts in the country of habitual residence to provide effective protection may properly be understood as an ameliorative consideration. Even if not formally categorized as such, however, that inquiry is functionally indistinguishable from the ameliorative analysis, as it bears directly on whether any available mechanisms would sufficiently mitigate an identified grave risk and permit safe return.

51

considered concurrently with the grave risk inquiry. Golan, 596 U.S. at 677-78.[12]

The Supreme Court then concluded that the Second Circuit's "atextual, categorical requirement" "in practice, rewrites the treaty [Convention.]" Id. (quoting Lozano v. Montoya Alvarez, 572 U.S. 1, 17 (2014)). Further, the Second Circuit rule had the functional effect of "improperly elevat[ing] return above the Convention's other objectives[,]" which include protection of the interests of children and their parents. Golan, 596 U.S. at 679.

In deciding how to deal with the particulars of the Golan case, the Supreme Court held, "[t]he Convention requires courts to make a discretionary determination as to whether to order return after making a finding of grave risk." Id. at 683 (emphasis added). Significantly, in remanding the case to the district court, the Supreme Court instructed that "[t]he District Court should determine whether the measures in question are adequate to order return in light of its factual findings concerning the risk to [the child], bearing in mind that the Convention sets as a primary goal the safety of the child." Id. at 683-84.

---

[12] While the inquiry into ameliorative measures may, in appropriate circumstances, be considered concurrently with the grave risk determination, it does not become an element of establishing grave risk itself. Rather, the grave-risk inquiry and the assessment of potential ameliorative measures remain analytically distinct, with the latter arising, if at all, within the court's separate exercise of discretion in determining whether return may nonetheless be appropriate.

"[T]he court's consideration of ameliorative measures must be guided by the legal principles and other requirements set forth in the Convention and ICARA." Id. at 679. "The Convention does not pursue return exclusively or at all costs. Rather, the Convention 'is designed to protect the interests of children and their parents,' and children's interests may point against return in some circumstances." Id. (quoting Lozano, 572 U.S. at 17) (internal citation omitted). As set forth in Golan, courts "must remain conscious of this purpose, as well as the Convention's other objectives and requirements, which constrain courts' discretion to consider ameliorative measures in at least three ways." Golan, 596 U.S. at 679. The first constraint is most relevant to the instant case in that it dictates that "any consideration of ameliorative measures must prioritize the child's physical and psychological safety." Id. at 680.

Golan thus provides invaluable guidance for how to proceed in this case. Having found that there is a grave risk that return of S.I.E.A. and M.A.E.A. to Paraguay would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation, the Court may, in the exercise of its discretion under the Convention, consider whether any ameliorative measures are sufficient to mitigate the risk of grave danger so as to justify ordering return of the children, notwithstanding the finding of grave risk. However, the question remains as to which

53

party bears the burden of proving to the Court that any considered ameliorative measures are sufficient.[13]

In this case, one considered ameliorative measure is the asserted ability and willingness of the courts in Paraguay to provide adequate protection for the children upon their return. But is it the Petitioner's burden to assure the Court that the courts in Paraguay are sufficiently willing and able to protect the children from the identified grave risk or, instead, is it Respondent's burden to prove that they are not?

Once Respondent has satisfied her burden of establishing, by clear and convincing evidence, that a grave risk exists, it would seem strange to then task her with additionally proving that the identified grave risk could not be sufficiently mitigated through court involvement. Indeed, such a framework would effectively require Respondent to construct and then refute hypothetical protective measures in order to preserve a grave risk finding already established by clear and convincing evidence. Instead, Petitioner, as the party opposing the grave risk defense and seeking return of the children, notwithstanding that finding, is

---

[13] Courts, of course, decide issues that are presented by the parties. See generally Margolin v. Nat'l Ass'n of Immigr. Judges, 608 U.S. ___ (2026) (per curiam); Clark v. Sweeney, 607 U.S. 7 (2025). This "burden of proof" issue has been sufficiently presented by the parties such that decision by this Court is appropriate. See ECF Nos. 65, 66, 105, 114. Alerted by the parties as to this issue, the Court, by ORDER (ECF No. 130), directed the parties to further brief the "burden of proof" issue, and the parties filed their respective briefs. See ECF Nos. 131, 132, 133, 135.

far better situated to bear the burden of demonstrating that the identified grave risk can, in fact, be sufficiently mitigated through ameliorative measures.

As the Eleventh Circuit explained in Baran:

> [t]o require a respondent to adduce evidence regarding the condition of the legal and social service systems in a country she has fled creates difficult problems of proof, and appears not to have been contemplated by the Convention.

Baran, 526 F.3d at 1348. Although it recognized the Convention's goal of quickly returning the child, the Eleventh Circuit explained that "the text of the Convention and the commentaries on it place a higher premium on children's [sic] safety than on their return." Id. And, for those reasons, the Eleventh Circuit declined "to impose on a responding parent a duty to prove that her child's country of habitual residence is unable or unwilling to ameliorate the grave risk of harm which would otherwise accompany the child's return." Id.

Because it is the Petitioner who contends that the authorities in the country of habitual residence can ameliorate the grave risk of harm, it is the Petitioner's burden to make that showing. That fundamental principle is manifest in several circuit court opinions. See Simcox, 511 F.3d at 605-06; Acosta v. Acosta, 725 F.3d 868, 877 (8th Cir. 2013). And, where instructing district courts how to proceed in assessing ameliorative measures on remand, the Supreme Court in Golan said that "[t]he District Court should

determine whether the measures in question are adequate to order return in light of its factual findings concerning the risk to [the child], bearing in mind that the Convention sets as a primary goal the safety of the child." Golan, 596 U.S. at 683-84. The record shows clearly and convincingly that return of the children to Mr. Ens Loblein in Paraguay would subject them to a grave risk of harm or otherwise subject them to intolerable circumstances. Petitioner takes the view that the authorities in Paraguay are capable of, and willing to, protect against that risk. It is true that the complaints filed by Ms. Alcaraz resulted in some keep away orders. But notwithstanding those orders, Mr. Ens Loblein's abuse of Ms. Alcaraz and the children continued. And the record shows that Paraguay's efforts to protect victims of domestic abuse were of limited effect. See supra pp. 34-36.

In this case, even assuming, arguendo, that the courts of Paraguay are both capable of issuing protective orders and willing to do so in this case, the Court is not persuaded that such measures would be sufficiently effective or reliable to mitigate the grave risk previously identified. As Golan instructs, "[t]he court may also find the grave risk so unequivocal, or the potential harm so severe, that ameliorative measures would be inappropriate." Id. at 682. That principle applies here. As the Seventh Circuit has recognized, "[b]ecause of the privacy of the family and parental control of children, most abuse of children by a parent goes

56

undetected." Van De Sande, 431 F.3d at 570-71 (citing Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987); Coy v. Iowa, 487 U.S. 1012, 1022 (1988) (concurring opinion)). In such circumstances, reliance on the protective capacity of foreign authorities may rest on an unrealistic premise where the underlying harm is unlikely to be detected or effectively prevented in practice. Accordingly, the relevant inquiry is not whether protective mechanisms exist in theory, but whether the Court can be satisfied that the children will in fact, and not merely in legal theory, be protected if returned in light of the established grave risk. See Van De Sande, 431 F.3d at 571 ("To give a father custody of children who are at great risk of harm from him, on the ground that they will be protected by the police of the father's country, would be to act on an unrealistic premise. The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody."). In turn, the Court finds that Petitioner in this case did not satisfy his burden of proving that the considered ameliorative measures are adequate to order return in light of its factual findings concerning the grave risk to S.I.E.A. and M.A.E.A.

Considering the Court's "grave risk" finding and the limited utility of the proposed ameliorative measures, the Court concludes that return of S.I.E.A. and M.A.E.A. to Paraguay is not appropriate under the Convention. The record establishes that the children

57

would face a grave risk of physical and psychological harm or otherwise be placed in an intolerable situation if returned to the custody of their father in Paraguay, and the Court is not persuaded that any available protective mechanisms would sufficiently mitigate that risk in practice. As Golan makes clear, where the potential harm is severe and the risk unequivocal, ameliorative measures may be deemed inappropriate in the exercise of the Court's discretion. Golan, 596 U.S. at 682. Accordingly, because return would expose the children to a grave risk of harm that cannot be adequately ameliorated, the petition for return will be denied.

## IV. CONCLUSION

For the reasons provided above, Petitioner Maik Evert Ens Loblein's Amended Verified Petition (ECF No. 7) will be denied by forthcoming order.

/s/   _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 29, 2026

58